Michael R. Lozeau (State Bar No. 142893)
E-mail: michael@lozeaudrury.com
LOZEAU DRURY LLP
1939 Harrison Street, Suite 150
Oakland, CA 94612
Tel: (510) 836-4200
Fax: (510) 836-4205

Shana Lazerow (State Bar No. 195491)
E-mail: slazerow@cbecal.org
COMMUNITIES FOR A BETTER ENVIRONMENT
120 Broadway, Suite 2
Richmond, CA 94804
Tel: (510) 302-0430 x 18
Fax: (510) 302-0438

Attorneys for Plaintiff
COMMUNITIES FOR A BETTER ENVIRONMENT

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| COMMUNITIES FOR A BETTER ENVIRONMENT, a non-profit corporation,<br><br>Plaintiff,<br><br>vs.<br><br>LOS ANGELES DEPARTMENT OF WATER AND POWER, a municipal utility,<br><br>Defendant. | Case No. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

COMPLAINT

1

COMMUNITIES FOR A BETTER ENVIRONMENT ("CBE"), a California non-profit corporation, by and through its counsel, hereby alleges:

## I.   **JURISDICTION AND VENUE**

1.      This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or "the Act").  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.      On April 15, 2019, Plaintiff provided notice of Defendant's violations of the Act, and of Plaintiff's intention to file suit against Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Los Angeles Region ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  A true and correct copy of CBE's notice letter is attached as Exhibit A, and is incorporated by reference.

3.      More than sixty days have passed since notice was served on Defendant and the State and federal agencies.  Plaintiff is informed and believes, and thereupon

COMPLAINT

alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4. Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## II.   **INTRODUCTION**

5. This complaint seeks relief from Defendant's discharges of polluted storm water from Defendant's industrial facility, called the Harbor Generating Station, located at 161 Island Avenue in Wilmington, California ("Facility"). These discharges are in violation of the Act and National Pollutant Discharge Elimination System ("NPDES") Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 97-03-DWQ ("1997 Permit"), as renewed by Water Quality Order No. 2014-0057-DWQ ("2015 Permit") (the permits are collectively referred to hereinafter as the "Permit" or "General Permit"). Defendant's violations of the discharge, treatment technology, monitoring requirements, and other procedural and substantive requirements of the Permit and the Act are ongoing and continuous.

6. With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations, such as those conducted by Defendant, pour into storm drains and local waterways. The consensus among agencies and water quality specialists is that storm water pollution accounts for more

COMPLAINT

3

than half of the total pollution entering surface waters each year.

7.      Los Angeles area waters are ecologically sensitive areas and are essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species.  Storm water and non-storm water contaminated with sediment, heavy metals, and other pollutants harm the special aesthetic and recreational significance that Los Angeles area waters have for people in the surrounding communities.  The public's use of Los Angeles area waters for water contact sports exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges.  Non-contact recreation and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges into Los Angeles area waters.

8.      Industrial facilities, like Defendant's, that are discharging polluted storm water and non-storm water contribute to the impairment of downstream waters and aquatic-dependent wildlife.  These contaminated discharges can and must be controlled for the ecosystem to regain its health.

### III.   PARTIES

9.      Plaintiff CBE is an environmental justice organization organized under the laws of the State of California with a local office in Wilmington, California.  CBE has approximately 6,000 members who live, recreate and work in and around waters of the State of California, including the Los Angeles Harbor.  Many of its members live and/or recreate in and around Los Angeles County.  CBE is dedicated to empowering low-income communities of color that seek a voice in determining the health of their

COMPLAINT

4

air, water and land.  To further these goals, CBE actively seeks federal and state agency implementation of the Act and other laws and, where necessary, directly initiates enforcement actions.

10.     CBE has members living in the communities near the Facility and the Los Angeles Harbor Watershed.  They enjoy using the Los Angeles Harbor and San Pedro Bay for recreation and other activities.  CBE members use and enjoy the waters into which Defendant has caused, is causing, and will continue to cause, pollutants to be discharged.  CBE members use those areas to recreate and view wildlife, among other activities.  Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments.  Thus, the interests of CBE's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Permit.  The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

11.     CBE brings this action on behalf of its members.  CBE's interest in reducing Defendant's discharges of pollutants into the Los Angeles Harbor, San Pedro Bay, and their tributaries and requiring Defendant to comply with the requirements of the General Permit are germane to its purposes.  Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of CBE.

12.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and one or more of its members, for which harm they have no plain, speedy or adequate remedy at law.

COMPLAINT

13.     Defendant LOS ANGELES DEPARTMENT OF POWER AND
WATER ("LADWP") is a municipal utility that owns and/or operates the Facility.

## IV.    STATUTORY BACKGROUND

### Clean Water Act

14.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of
any pollutant into waters of the United States, unless such discharge is in compliance
with various enumerated sections of the Act.  Among other things, Section 301(a)
prohibits discharges not authorized by, or in violation of, the terms of an NPDES
permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

15.     Section 402(p) of the Act establishes a framework for regulating
municipal and industrial storm water discharges under the NPDES program.  33
U.S.C. § 1342(p).  States with approved NPDES permit programs are authorized by
Section 402(p) to regulate industrial storm water discharges through individual
permits issued to dischargers or through the issuance of a single, statewide general
permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(p).

16.     The EPA promulgated regulations for the Section 402 NPDES permit
program defining waters of the United States. S*ee* 40 C.F.R. § 122.2.  The EPA
interprets waters of the United States to include not only traditionally navigable
waters but also other waters, including waters tributary to navigable waters, wetlands
adjacent to navigable waters, and other waters including intermittent streams that
could affect interstate commerce.  The Act requires any person who discharges or

COMPLAINT

6

proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. 40 C.F.R. § 122.21.

17.    Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

**General Permit**

18.    The State Board elected to issue a statewide general permit for industrial storm water discharges.  The State Board originally issued the General Permit on or about November 19, 1991.  The State Board modified the General Permit on or about September 17, 1992.  Pertinent to this action, the State Board reissued the General Permit on or about April 17, 1997 (the "1997 Permit"), and again on or about April 1, 2014 (the "2015 Permit"), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).  The 1997 Permit was in effect between 1997 and June 30, 2015. The 2015 Permit went into effect on July 1, 2015.  The 2015 Permit maintains, or makes more stringent, the requirements of the 1997 Permit.

19.    In order to discharge storm water lawfully in California, industrial facilities must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.  33 U.S.C. § 1311(a).

20.    The General Permit contains several prohibitions.  Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit prohibit discharges unless pollutants have been reduced or prevented through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and

COMPLAINT

nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  Discharge Prohibition A(2) of the 1997 Permit and Discharge Prohibition III(C) of the 2015 Permit prohibit storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitation C(1) of the 1997 Permit and Receiving Water Limitation VI(B) of the 2015 Permit prohibit storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the 2015 Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

21.    In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI").  Dischargers have been required to file NOIs since March 30, 1992.

22.    Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP").  The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  For dischargers beginning industrial activities before October 1, 1992, the General Permit requires

that an initial SWPPP has been developed and implemented before October 1, 1992. The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-storm water discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges.  1997 Permit, § A(2); 2015 Permit, § X(C).  These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.  To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary.  1997 Permit, §§ A(9), (10); 2015 Permit, § X(B).  Failure to develop or implement an adequate SWPPP, or update or revise an existing SWPPP as required, is a violation of the General Permit.  2015 Permit, Fact Sheet § I(1).

23.    Sections A(3)-A(10) of the 1997 Permit set forth the requirements for a SWPPP.  Among other requirements, the SWPPP must include: a pollution prevention team; a site map; a list of significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of the BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective. Sections X(D) – X(I) of the 2015 Permit set forth essentially the same SWPPP requirements as the 1997 Permit, except that all dischargers are now required to

COMPLAINT

9

develop and implement a set of minimum BMPs, as well as any advanced BMPs as necessary to achieve BAT/BCT, which serve as the basis for compliance with the 2015 Permit's technology-based effluent limitations and receiving water limitations. The 2015 Permit further requires a more comprehensive assessment of potential pollutant sources than the 1997 Permit; more specific BMP descriptions; and an additional BMP summary table identifying each identified area of industrial activity, the associated industrial pollutant sources, the industrial pollutants, and the BMPs being implemented.  2015 Permit, §§ X(G)(2), (4), (5).  Section X(E) of the 2015 Permit requires that the SWPPP map depict, *inter alia*, all storm water discharge locations.

24.     The 2015 Permit requires dischargers to implement and maintain, to the extent feasible, all of the following minimum BMPs in order to reduce or prevent pollutants in industrial storm water discharges: good housekeeping, preventive maintenance, spill and leak prevention and response, material handling and waste management, erosion and sediment controls, an employee training program, and quality assurance and record keeping.  2015 Permit, § X(H)(1).  Failure to implement these minimum BMPs is a violation of the 2015 Permit.  2015 Permit, Fact Sheet § I(2)(o).  The 2015 Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  2015 Permit, § X(H)(2).

COMPLAINT

10

Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the 2015 Permit. *Id*. The 2015 Permit also requires that the SWPPP include BMP descriptions and a BMP Summary Table. 2015 Permit, § X(H)(4), (5).

25. The General Permit requires dischargers to develop and implement an adequate written Monitoring Implementation Program ("MIP") (previously known as the Monitoring and Reporting Program). The primary objective of the MIP is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations. As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented. The 1997 Permit requires dischargers to collect storm water samples during the first hour of discharge from the first storm event of the wet season, and at least one other storm event during the wet season, from all storm water discharge locations at a facility. 1997 Permit, § B(5). The 2015 Permit mandates that facility operators sample *four* (rather than two) storm water discharges from all discharge locations over the course of the reporting year. 2015 Permit, §§ XI(B)(2), (3).

26. Under the 1997 Permit, facilities must analyze storm water samples for "toxic chemicals and other pollutants that are likely to be present in storm water

COMPLAINT

11

discharges in significant quantities."  1997 Permit, § B(5)(c)(ii).  Under the 2015

Permit, facilities must analyze storm water samples for "[a]dditional parameters

identified by the Discharger on a facility-specific basis that serve as indicators of the

presence of all industrial pollutants identified in the pollutant source assessment."

2015 Permit, § XI(B)(6)(c).

27.    Under the 2015 Permit, a facility must analyze collected samples for

"[a]dditional applicable industrial parameters related to receiving waters with 303(d)

listed impairments or approved TMDLs based on the assessment in Section

X.G.2.a.ix."  2015 Permit, § XI(B)(6)(d).

28.    Facilities are required to make monthly visual observations of storm

water discharges.  The visual observations must represent the quality and quantity of

the facility's storm water discharges from the storm event.  1997 Permit, § B(7); 2015

Permit, § XI.A.

29.    Section XI(B)(2) of the 2015 Permit requires that dischargers collect and

analyze storm water samples from two qualifying storm events ("QSEs") during the

first half of each reporting year (July 1 to December 31) and two QSEs during the

second half of each reporting year (January 1 to June 30).

30.    Section B(14) of the 1997 Permit requires dischargers to include

laboratory reports with their Annual Reports submitted to the Regional Board.  This

requirement is continued with the 2015 Permit.  Fact Sheet, Paragraph O.

31.    The 1997 Permit, in relevant part, requires that the Annual Report

include an Annual Comprehensive Site Compliance Evaluation Report ("ACSCE

COMPLAINT

12

Report").  1997 Permit, § B(14).  As part of the ACSCE Report, the facility operator must review and evaluate all the BMPs to determine whether they are adequate or whether SWPPP revisions are needed.  The Annual Report must be signed and certified by a duly authorized representative, under penalty of law that the information submitted is true, accurate, and complete to the best of his or her knowledge.  The 2015 Permit now requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results.  2015 Permit, § XV.

32.    The General Permit does not provide for any mixing zones by dischargers.  The General Permit does not provide for any receiving water dilution credits to be applied by dischargers.

**Basin Plan**

33.    The Regional Board has identified beneficial uses and established water quality standards for the Los Angeles Harbor and the San Pedro Bay in the "Water Quality Control Plan, Los Angeles Region Basin Plan for the Coastal Watersheds of Los Angeles and Ventura Counties," generally referred to as the Basin Plan.

34.    The beneficial uses of these waters include, among others, water contact recreation, non-contact water recreation, commercial and sport fishing, marine habitat, and rare, threatened, or endangered species.  Non-contact water recreation use is defined as "[u]ses of water for recreational activities involving proximity to water, but not normally involving contact with water where water ingestion is reasonably

COMPLAINT

possible.  These uses include, but are not limited to, picnicking, sunbathing, hiking, beachcombing, camping, boating, tidepool and marine life study, hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities."  Basin Plan at 2-2.

35.    Discharges of pollutants at levels above water quality standards contribute to the impairment of beneficial uses of the waters receiving the discharge, in violation of the General Permit.

36.    The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in, human, plant, animal, or aquatic life."

37.    The Basin Plan includes a narrative oil and grease standard which states that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses."

38.    The Basin Plan provides that "[w]aters shall not contain suspended or settleable material in concentrations that cause nuisance or adversely affect beneficial uses."

39.    The Basin Plan provides that "[t]he pH of inland surface waters shall not be raised above 8.5 or depressed below 6.5."

40.    The Basin Plan provides that "[s]urface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any

COMPLAINT
                                                  14

designated beneficial use."

41.    The Basin Plan provides that "[w]aters shall not contain floating materials, including solids, liquids, foams, and scum, in concentrations that cause nuisance or adversely affect beneficial uses."

42.    The Basin Plan provides that "[w]aters shall be free of coloration that causes nuisance or adversely affects beneficial uses."

43.    For marine waters designated for water contact recreation, the Basin Plan provides water quality objectives for total and fecal coliform bacteria.  The Basin Plan provides the following single sample limits:

a.  Total coliform density shall not exceed 10,000/100 ml.

b.  Fecal coliform density shall not exceed 400/100 ml.

c.  Enterococcus density shall not exceed 104/100 ml.

d.  Total coliform density shall not exceed 1,000/100 ml, if the ratio of fecal-to-total coliform exceeds 0.1.

44.    For discharges of polychlorinated biphenyls ("PCBs") to estuarine waters, the Basin Plan provides that for "[p]ass-through or uncontrollable discharges to waters of the Region, or at locations where the waste can subsequently reach water of the Region, are limited to…30 ng/L (daily average)" to protect aquatic life.

45.    For discharges of un-ionized ammonia to inland surface waters not characteristic of freshwater, the Basin Plan provides that "the one-hour average concentration shall not exceed 0.233 mg/L."

46.    The EPA has adopted saltwater numeric water quality standards for

COMPLAINT

15

copper of 0.0048 mg/L (Criteria Maximum Concentration – "CMC"); and zinc of 0.09 mg/L (CMC).  65 Fed. Reg. 31712 (May 18, 2000) (California Toxics Rule).  The California Toxics Rule ("CTR") also provides a water quality standard for PCBs of 0.00017 µg/L (Human Health – for consumption of Organisms Only).

47.     The EPA 303(d) List of Water Quality Limited Segments lists the Los Angeles/Long Beach Inner Harbor as impaired for copper, PCBs, toxicity, and zinc, among other pollutants.  See https://www.waterboards.ca.gov/water_issues/programs/ tmdl/integrated2014_2016.shtml.  San Pedro Bay is impaired for toxicity and PCBs, among other pollutants.

48.     EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT.  These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish.  The following EPA benchmarks have been established for pollution parameters applicable to the Facility: pH – 6.0 - 9.0 standard units ("s.u."); total suspended solids ("TSS") – 100 mg/L; oil and grease ("O&G") – 15 mg/L; chemical oxygen demand ("COD") — 120 mg/L; iron – 1.0 mg/L; aluminum – 0.75 mg/L; zinc – 0.26 mg/L; lead – 0.262 mg/L; nitrate + nitrite as nitrogen ("N+N") – 0.68 mg/L; magnesium –  0.064 mg/L; and copper – 0.0332 mg/L.

49.     The Numeric Action Levels ("NALs") in the 2015 Permit are derived from these benchmarks.  The 2015 Permit incorporates annual NALs, which are

COMPLAINT

16

derived from the 2008 MSGP benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset.  The following annual NALs have been established under the 2015 Permit: TSS – 100 mg/L; O&G – 15 mg/L; COD – 120 mg/L; iron – 1.0 mg/L; aluminum – 0.75 mg/L; zinc – 0.26 mg/L; lead – 0.262 mg/L; N+N – 0.68 mg/L; magnesium – 0.064 mg/L.  An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL.  The reporting year runs from July 1 to June 30.  The 2015 Permit also establishes the following instantaneous maximum NALs: pH – 6.0-9.0 s.u.; TSS – 400 mg/L; and O&G – 25 mg/L.  An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  When a discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires a revision of the SWPPP and additional BMPs.  If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status."  For Level 2 Status, a discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background.

50.    Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or

COMPLAINT

17

partnerships, for violations of NPDES permit requirements.  33 U.S.C. §§ 1365(a)(1) and (f), § 1362(5).  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $53,484 for violations occurring after November 2, 2015; and up to $37,500 per day per violation occurring since October 28, 2011, up to and including November 2, 2015, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365.  *See also* 40 C.F.R. §§ 19.1 - 19.4.

## V.      STATEMENT OF FACTS

51.     Defendant owns and/or operates the Facility, a natural gas-fueled, combined cycle, electric power generating facility located in Wilmington, CA.

52.     The Facility falls within Standard Industrial Classification ("SIC") Code 4911.

53.     The Facility covers an area of approximately 20.5 acres across three parcels.

54.     Based on CBE's investigation, including a review of the Facility's Notice of Intent to Comply with the Terms of the Industrial General Permit ("NOI"), SWPPP, aerial photography, and CBE's information and belief, storm water is collected and discharged from the Facility via at least eight storm water discharge locations.  Storm water discharged from the Facility flows into MS4 [municipal separate storm sewer system] catch basins that discharge to the Los Angeles Harbor, which flows into San Pedro Bay (collectively, "Facility Receiving Waters").

55.     Information available to Plaintiff indicates that the Facility Receiving

COMPLAINT

Waters are waters of the United States.

56.    Plaintiff is informed and believes, and thereupon alleges that the storm water flows over the surface of the Facility where industrial activities occur including activities associated with the primary activity of natural gas-fueled, combined cycle, electric power generating.  Industrial activities also include fuel storage, hazardous waste management and disposal, maintenance, chemical unloading, and material handling and storage.   Plaintiff is informed and believes, and thereupon alleges that storm water flowing over these areas collects metals, pH-altering substances, nitrates, nitrites, and other pollutants as it flows towards the storm water discharge locations.

57.    On information and belief, Plaintiff alleges that the majority of storm water discharges from the Facility contain storm water that is commingled with runoff from areas at the Facility where industrial processes occur.

58.    On information and belief, CBE alleges that there are insufficient structural storm water control measures installed at the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the management practices at the Facility are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.  The Facility lacks sufficient structural controls such as grading, berming, roofing, containment, or drainage structures to prevent rainfall and storm water flows from coming into contact with exposed areas of contaminants.  The Facility lacks sufficient structural controls to prevent the discharge of water once contaminated.  The Facility lacks adequate storm water pollution treatment technologies to treat storm water once contaminated.

COMPLAINT

19

59.     Since at least December 6, 2013, Defendant has taken samples or arranged for samples to be taken of storm water discharges at the Facility.  The sample results were reported in the Facility's Annual Reports submitted to the Regional Board or in reports submitted to the State Board via the Stormwater Multiple Application and Report Tracking System ("SMARTS").  Defendant certified each of those reports pursuant to the General Permit.

60.     In Annual Reports and storm water sampling results submitted to the Regional Board and State Board, the Facility has consistently reported high pollutant levels from its storm water sampling results.

61.     The Facility has reported numerous discharges in excess of numeric water quality standards established in the Basin Plan.  These observations have thus violated numeric water quality standards established in the Basin Plan and have thus violated Discharge Prohibition A(2) and Receiving Water Limitations C(1) and C(2) of the 1997 Permit; Discharge Prohibitions III(C) and III(D) and Receiving Water Limitations VI(A) and VI(B) of the 2015 Permit; and are evidence of ongoing violations of Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit.

62.     The Facility has reported numerous discharges outside the range of the numeric water quality standard for pH of 6.5 – 8.5 established in the Basin Plan. Defendant analyzed storm water discharges with a pH level below 6.5 on the following dates: January 9, 2018; February, 17, 2017; February 3, 2017; January 20, 2017; January 19, 2017; January 12, 2017; January 2, 2017; December 22, 2016;

COMPLAINT

December 16, 2016; December 15, 2016; November 26, 2016; November 20, 2016; March 6, 2016; and January 5, 2016.

63.     The levels of pH in storm water detected at the Facility have been below the benchmark value and annual NAL for pH of 6.0 – 9.0 s.u. established by EPA and the State Board, respectively.  Defendant analyzed storm water discharged from the Facility with a pH less than 6.0 s.u. on the following dates: February, 17, 2017; December 22, 2016; December 16, 2016; December 15, 2016; November 26, 2016; and November 20, 2016.

64.     The levels of zinc in storm water detected by the Facility have exceeded the saltwater numeric water quality standard established by the EPA of 0.09 mg/L for zinc (CMC).  For example, on January 9, 2018, the level of zinc measured at one of the Facility's storm water outfalls was 3.1 mg/L.  That level of zinc is over 34 times the CMC for zinc.  Defendant also has measured levels of zinc in storm water discharged from the Facility in excess of 0.09 mg/L on the following dates: March 6, 2019; March 2, 2019; February 13, 2019; February 9, 2019; January 31, 2019; January 5, 2019; December 5, 2018; November 29, 2018; November 22, 2018; March 22, 2018; February 18, 2017; February 17, 2017; February 10, 2017; February 3, 2017; January 20, 2017; January 19, 2017; January 12, 2017; January 2, 2017; December 22, 2016; December 16, 2016; December 15, 2016; November 26, 2016; November 20, 2016; March 6, 2016; January 5, 2016; December 30, 2014; and November 1, 2014.

65.     The levels of zinc in storm water detected by the Facility have exceeded

COMPLAINT

21

the benchmark value and annual NAL for zinc of 0.26 mg/L established by EPA and the State Board, respectively.  For example, on January 9, 2018, the level of zinc measured at one of the Facility's storm water outfalls was 3.1 mg/L.  That level of zinc is nearly 12 times the benchmark value and annual NAL for zinc.  Defendant also has measured levels of zinc in storm water discharged from the Facility in excess of 0.26 mg/L on the following dates: March 2, 2019; February 13, 2019; February 9, 2019; January 31, 2019; January 5, 2019; December 5, 2018; November 29, 2018; November 22, 2018; March 22, 2018; February 18, 2017; February 17, 2017; February 10, 2017; February 3, 2017; January 20, 2017; January 19, 2017; January 12, 2017; January 2, 2017; December 22, 2016; December 16, 2016; December 15, 2016; November 26, 2016; November 20, 2016; March 6, 2016; January 5, 2016; December 30, 2014; and November 1, 2014.

66.    The levels of copper in storm water detected by the Facility have exceeded the saltwater numeric water quality standard established by the EPA of 0.0048 mg/L for copper (CMC).  For example, on January 9, 2018, the level of copper measured at one of the Facility's storm water outfalls was 0.16 mg/L.  That level of copper is over 33 times the CMC for copper.  Defendant also has measured levels of copper in storm water discharged from the Facility in excess of 0.0048 mg/L on the following dates: January 31, 2019; January 5, 2019; December 5, 2018; November 29, 2018; November 22, 2018; March 22, 2018; February 18, 2017; February 17, 2017; February 10, 2017; February 3, 2017; January 20, 2017; January 19, 2017; January 12, 2017; January 2, 2017; December 22, 2016; December 16, 2016; December 15, 2016;

COMPLAINT

22

November 26, 2016; November 20, 2016; March 6, 2016; January 5, 2016; December 30, 2014; and November 1, 2014.

67.    The levels of copper in storm water detected by the Facility have exceeded the benchmark value and annual NAL for copper of 0.0332 mg/L established by EPA and the State Board, respectively.  For example, on January 9, 2018, the level of copper measured at one of the Facility's storm water outfalls was 0.16 mg/L.  That level of copper is nearly 5 times the benchmark value and annual NAL for copper.  Defendant also has measured levels of copper in storm water discharged from the Facility in excess of 0.0332 mg/L on the following dates: January 31, 2019; January 5, 2019; December 5, 2018; November 29, 2018; November 22, 2018; March 22, 2018; February 17, 2017; February 10, 2017; February 3, 2017; January 20, 2017; December 22, 2016; December 16, 2016; November 26, 2016; November 20, 2016; March 6, 2016; January 5, 2016; December 30, 2014; and November 1, 2014.

68.    The levels of ammonia in storm water detected by the Facility have exceeded the one-hour average concentration for ammonia of 0.233 mg/L established by the Basin Plan.  For example, on January 9, 2018, the level of ammonia measured at one of the Facility's storm water outfalls was 0.6 mg/L.  That level of ammonia is over 2.5 times the one-hour average concentration for ammonia.  Defendant also has measured levels of ammonia in storm water discharged from the Facility in excess of 0.233 mg/L on the following dates: December 5, 2018; February 17, 2017; February 10, 2017; February 3, 2017; January 20, 2017; January 12, 2017; January 2, 2017;

COMPLAINT

1 December 16, 2016; December 15, 2016; November 26, 2016; November 20, 2016;

2 and January 5, 2016.

3        69.    On March 22, 2018, Defendant measured levels of PCBs in storm water

4 discharged from two of the Facility's storm water outfalls that both exceeded the

5

6 Basin Plan's limit of 0.03 µg/L for discharges of PCBs to estuarine waters as well as

7 the CTR's water quality standard for PCBs of 0.00017 µg/L.

8        70.    The levels of total coliform density in storm water discharges from the

9

10 Facility measured by Defendant on November 29, 2018; March 22, 2018; and January

11 9, 2018, have exceeded the Basin Plan's water quality objectives for total coliform

12 density, fecal coliform density, and enterococcus density.

13        71.    The levels of TSS in storm water detected by the Facility have exceeded

14 the benchmark value and annual NAL for TSS of 100 mg/L established by EPA and

15

16 the State Board, respectively.  For example, on January 9, 2018, the level of TSS

17 measured by Defendant at one of the Facility's storm water outfalls was 314 mg/L.

18 That level of TSS is over 3 times the benchmark value and annual NAL for TSS.

19 Defendant also measured levels of TSS in storm water discharged from the Facility in

20

21 excess of 100 mg/L on the following dates: January 5, 2019; December 5, 2018;

22 November 29, 2018; November 22, 2018; March 22, 2018; February 17, 2017;

23 February 3, 2017; December 22, 2016; December 16, 2016; December 15, 2016;

24 November 20, 2016; March 6, 2016; and January 5, 2016.

25        72.    The level of O&G in storm water detected by the Facility have exceeded

26 the benchmark value and annual NAL for TSS of 15 mg/L.  On January 9, 2018,

27

28 COMPLAINT

Defendant measured a level of O&G of 39 mg/L in storm water discharged from one of the outfalls of the Facility.  On December 5, 2018, Defendant measured a level of O&G of 17 mg/L in storm water discharged from one of the outfalls of the Facility.

73.    The levels of iron in storm water detected by the Facility have exceeded the benchmark value and annual NAL for iron of 1 mg/L established by EPA and the State Board, respectively.  For example, on December 5, 2018, the level of iron measured by Defendant at one of the Facility's storm water outfalls was 12 mg/L. That level of iron is 12 times the benchmark value and annual NAL for iron. Defendant also measured levels of iron in storm water discharged from the Facility in excess of 1 mg/L on the following dates: March 6, 2019; February 13, 2019; January 31, 2019; January 5, 2019; November 29, 2018; November 22, 2018; March 22, 2018; January 9, 2018; February 17, 2017; February 10, 2017; February 3, 2017; January 20, 2017; January 19, 2017; January 12, 2017; December 22, 2016; December 16, 2016; December 15, 2016; November 26, 2016; November 20, 2016; March 6, 2016; January 5, 2016; December 30, 2014; and November 1, 2014.

74.    The levels of aluminum in storm water detected by the Facility have exceeded the benchmark value and annual NAL for aluminum of 0.75 mg/L established by EPA and the State Board, respectively.  For example, on November 22, 2018, the level of aluminum measured by Defendant at one of the Facility's storm water outfalls was 12 mg/L.  That level of aluminum is 16 times the benchmark value and annual NAL for aluminum.  Defendant also measured levels of aluminum in storm water discharged from the Facility in excess of 0.75 mg/L on the following

COMPLAINT

25

dates: March 6, 2019; March 2, 2019; February 13, 2019; February 9, 2019; January 31, 2019; January 5, 2019; December 5, 2018; November 29, 2018; March 22, 2018; January 9, 2018; February 17, 2017; February 10, 2017; February 3, 2017; January 20, 2017; January 19, 2017; January 12, 2017; December 22, 2016; December 16, 2016; December 15, 2016; November 26, 2016; November 20, 2016; March 6, 2016; and January 5, 2016.

75.     The levels of N+N in storm water detected by the Facility have exceeded the benchmark value and annual NAL for N+N of 0.68 mg/L established by EPA and the State Board, respectively.  For example, on March 22, 2018, the level of N+N measured by Defendant at one of the Facility's storm water outfalls was 3.2 mg/L. That level of N+N is almost 5 times the benchmark value and annual NAL for N+N. Defendant also measured levels of N+N in storm water discharged from the Facility in excess of 0.68 mg/L on the following dates: March 6, 2019; February 13, 2019; January 31, 2019; January 5, 2019; December 5, 2018; November 29, 2018; January 9, 2018; December 16, 2016; December 15, 2016; November 26, 2016; November 20, 2016; and March 6, 2016.

76.     The levels of magnesium in storm water detected by the Facility have exceeded the benchmark value and annual NAL for magnesium of 0.064 mg/L established by EPA and the State Board, respectively.  For example, on January 9, 2018, the level of magnesium measured by Defendant at one of the Facility's storm water outfalls was 2.3 mg/L.  That level of magnesium is over 10 times the benchmark value and annual NAL for magnesium.  Defendant also measured levels of

COMPLAINT

26

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

magnesium in storm water discharged from the Facility in excess of 0.064 mg/L on the following dates: March 6, 2019; March 2, 2019; February 13, 2019; February 9, 2019; January 31, 2019; January 5, 2019; December 5, 2018; November 29, 2018; November 22, 2018; March 22, 2018; February 18, 2017; February 17, 2017; February 10, 2017; February 3, 2017; January 20, 2017; January 19, 2017; January 12, 2017; January 2, 2017; December 22, 2016; December 16, 2016; December 15, 2016; November 26, 2016; November 20, 2016; March 6, 2016; and January 5, 2016.

77.     The levels of COD in storm water detected by the Facility have exceeded the benchmark value and annual NAL for COD of 120 mg/L established by EPA and the State Board, respectively.  For example, on January 9, 2018, the level of COD measured by Defendant at one of the Facility's storm water outfalls was 246 mg/L. That level of COD is over twice the benchmark value and annual NAL for COD. Defendant also measured levels of COD in storm water discharged from the Facility in excess of 120 mg/L on the following dates: December 15, 2016; November 20, 2016; March 6, 2016; and January 5, 2016.

78.     On information and belief, CBE alleges that LADWP failed to collect and analyze a second storm water discharge from sampling locations 5, 7, and, and 8 during the second half of the 2017-2018 reporting year.

79.     On information and belief, CBE alleges that during the first half of the 2015-2016 reporting year, LADWP failed to collect and analyze storm water samples at the Facility from the two required storm events during those portions of the reporting year.

COMPLAINT                                                   27

80.    On information and belief, Plaintiff alleges that since at least August 15, 2014, Defendant has failed to implement BAT and BCT at the Facility for its discharges of pH, zinc, copper, ammonia, PCBs, total coliform density, fecal coliform density, enterococcus density, TSS, O&G, iron, aluminum, N+N, magnesium, COD, and other potentially un-monitored pollutants.  Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit requires that Defendant implement BAT for toxic and nonconventional pollutants and BCT for conventional pollutants by no later than October 1, 1992.  As of the date of this Complaint, Defendant has failed to implement BAT and BCT.

81.    On information and belief, Plaintiff alleges that since at least August 15, 2014, Defendant has failed to implement an adequate SWPPP for the Facility. Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not set forth site-specific best management practices for the facility that are consistent with BAT or BCT for the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not comply with the requirements of Section X(H) of the 2015 Permit.  The SWPPP also fails to identify and implement advanced BMPs that are not being implemented at the Facility because they do not reflect best industry practice considering BAT/BCT. According to information available to CBE, the Facility's SWPPP has not been evaluated to ensure its effectiveness and revised where necessary to further reduce pollutant discharges.  Plaintiff is informed and believes, and thereupon alleges, that the SWPPP does not include each of the mandatory elements required by the General

COMPLAINT

28

Permit.  CBE alleges that the SWPPP fails to comply with Sections X.A.9, X.D.1.c, X.E, X.F, X.G.1.a, X.G.1.b, X.G.1.c, X.G.1.e, X.G.2.b, X.H, X.I, XI.C.4, X.I.4, and X.I.5 of the 2015 Permit.

82.     On information and belief, CBE alleges that Defendant's Level 2 ERA Technical Report fails to comply with the requirements of Section XII.D.2 of the 2015 Permit.

83.     Information available to CBE indicates that as a result of these practices, storm water containing excessive pollutants is being discharged from the Facility during rain events into channels that discharge to the Los Angeles Harbor, which flows into San Pedro Bay.

84.     Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed and continues to fail to alter the Facility's SWPPP and site-specific BMPs consistent with the General Permit.

85.     Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.  Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuous.

///

///

///

///

COMPLAINT

29

## VI.  CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Failure to Implement the Best Available and
### Best Conventional Treatment Technologies
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

86.  Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

87.  The General Permit's SWPPP requirements and Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  Defendant has failed to implement BAT and BCT at the Facility for their discharges of pH, zinc, copper, ammonia, PCBs, total coliform density, fecal coliform density, enterococcus density, TSS, O&G, iron, aluminum, N+N, magnesium, COD, and other potentially un-monitored pollutants in violation of Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit.

88.  Each day since August 15, 2014,, that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

89.  Defendant has been in violation of the BAT/BCT requirements every day since August 15, 2014,.  Defendant continues to be in violation of the BAT/BCT requirements each day that it fails to develop and fully implement BAT/BCT at the

Facility.

### SECOND CAUSE OF ACTION
**Discharges of Contaminated Storm Water
in Violation of Permit Conditions and the Act
(Violations of 33 U.S.C. §§ 1311, 1342)**

90.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

91.     Discharge Prohibition A(2) of the 1997 Permit and Discharge Prohibition III(C) of the 2015 Permit prohibit storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance. Receiving Water Limitation C(1) of the 1997 Permit and Receiving Water Limitation VI(B) of the 2015 Permit prohibit storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the 2015 Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

92.     Plaintiff is informed and believes, and thereupon alleges, that since at least December 6, 2013, Defendant has been discharging polluted storm water from the Facility in excess of applicable water quality standards for pH, zinc, copper, ammonia, PCBs, total coliform density, fecal coliform density, and enterococcus density in violation of Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water

COMPLAINT

31

Limitation VI(A) and Discharge Prohibition III(D) of the 2015 Permit.

93.     During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with pH-altering substances, metals, PCBs, zinc, total and fecal coliform bacteria, and other potentially un-monitored pollutants at levels above applicable water quality standards.  The storm water from the Facility flows untreated into channels that that discharge to the Los Angeles Harbor, which flows into San Pedro Bay.

94.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

95.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation C(1) of the General Permit.

96.     Every day since at least August 15, 2014,, that Defendant has discharged and continues to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

///

///

///

COMPLAINT

32

**THIRD CAUSE OF ACTION**
**Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

97.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

98.     The General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP no later than October 1, 1992.

99.     Defendant has failed to develop and implement an adequate SWPPP for the Facility.  Defendant's ongoing failure to develop and implement adequate SWPPP for the Facility, is evidenced by, *inter alia*, Defendant's failure to justify each minimum and advanced BMP not being implemented.

100.   Defendant has failed to update the SWPPP for the Facility in response to the analytical results of the Facility's storm water monitoring.

101.   Each day since August 15, 2014,, that Defendant has failed to develop, implement and update an adequate SWPPP for the Facility, respectively, is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

102.   Defendant has been in violation of the Permit's SWPPP requirements every day since August 15, 2014,.  Defendant continues to be in violation of the SWPPP requirements each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

COMPLAINT

33

**FOURTH CAUSE OF ACTION**
**Failure to Develop and Implement an**
**Adequate Monitoring Implementation Plan**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

103.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

104.    The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including, *inter alia*, sampling and analysis of discharges) no later than October 1, 1992.

105.    Defendant has failed to develop and implement an adequate MIP for the Facility.

106.    Defendant's ongoing failure to develop and implement an adequate MIP program is evidenced by, *inter alia*, its failure to collect and analyze samples from all storm water discharges at the Facility.

107.    Each day since at least August 15, 2014, that Defendant has failed to develop and implement an adequate MIP for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

///

///

///

COMPLAINT

34

**FIFTH CAUSE OF ACTION**
**Failure to Comply with**
**Requirement for Exceedance Response Actions**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

108.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

109.   The General Permit requires that a Level 2 ERA Technical Report contain one or more of the following demonstrations: Industrial Activity BMPs Demonstration, Non-Industrial Pollutant Source Demonstration, and/or Natural Background Pollutant Source Demonstration.

110.   Defendant has failed to submit a Level 2 ERA Technical Report that complies with these requirements.

111.   Each day since at least December 31, 2018, that Defendant has failed to prepare and submit an adequate Level 2 ERA Technical Report for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  This is an ongoing and continuous violation of the Act.

## VII.   RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.  Declare Defendant to have violated and to be in violation of the Act as alleged herein;

b.  Enjoin Defendant from discharging polluted storm water from the

COMPLAINT

35

Facility unless authorized by the 2015 Permit;

   c. Enjoin Defendant from further violating the substantive and procedural requirements of the 2015 Permit;

   d. Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

   e. Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

   f. Order Defendant to comply with the Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

   g. Order Defendant to prepare a SWPPP for the Facility consistent with the Permit's requirements and implement procedures to regularly review and update the SWPPP;

   h. Order Defendant to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

   i. Order Defendant to prepare an adequate Level 2 ERA Technical Report;

   j. Order Defendant to pay civil penalties of up to $37,500 per day per violation for each violation of the Act since October 28, 2011, up to and including November 2, 2015, and up to $53,484 for violations occurring after November 2, 2015,

COMPLAINT

pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

k.  Order Defendant to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

l.  Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

m. Award any such other and further relief as this Court may deem appropriate.

Dated: October 14, 2019          Respectfully submitted,

By:     _/s/ Michael R. Lozeau_____
        Michael R. Lozeau
        LOZEAU DRURY LLP
        Attorneys for Communities for a Better
        Environment

COMPLAINT

37